UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

Civil No. 10-3762 (RHK/FLN)

John D. Rositzki,

        Plaintiff,

       v.                       **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

        Defendant.

_____

Edward C, Olson, Esq., for Plaintiff

Lonnie F. Bryan, Assistant United States Attorney, for Defendant

_____

Plaintiff John Rositzki seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").   See 42 U.S.C. §§ 405(g); 1383(c).  The matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  This Court has jurisdiction over the claims pursuant to 42 U.S.C. §§ 405(g); 1383(c).  The parties submitted cross-motions for summary judgment.  (Doc. Nos. 13, 16).  For the reasons which follow, this Court recommends that Plaintiff's motion for summary judgment be denied and Defendant's motion for summary judgment be granted.

## I.   INTRODUCTION

Plaintiff filed applications for DIB and SSI on May 17, 2007.  (Tr. 123-30).  The next day, he amended his disability onset date, for DIB purposes, to April 25, 2007.  (Tr. 131).  Plaintiff's date last insured was December 31, 2012.  (Tr. 13).  Plaintiff's applications were denied initially and upon reconsideration.  (Tr. 63-67, 77-82).  Plaintiff requested a hearing before an administrative law judge ("ALJ"), and the hearing was held on October 1, 2009.  (Tr. 83-84, 25-57).  On December 14, 2009, the ALJ issued a decision denying Plaintiff's claims.  (Tr. 8-24).  The Appeals Council denied Plaintiff's request for review on August 6, 2010 (Tr. 1-5), making the ALJ's decision final for purposes of judicial review.  See 20 C.F.R. §§ 404.981, 416.1481.  Plaintiff commenced this action seeking judicial review of the Commissioner's decision on August 26, 2010.

## II.   STATEMENT OF FACTS

### A.   Background

Plaintiff alleges disability from severe pain of the right hip and leg, inability to use his foot, and imbalance.  (Tr. 153).  Later, Plaintiff also alleged low back pain, difficulty sleeping and concentrating, and major depression.  (Tr. 174).  Plaintiff's birthday is January 6, 1948, and he was 59-years-old on the onset date, April 25, 2007.  (Tr. 123).  He has a high school education and additional job training.  (Tr. 158).  His last job was a dental lab technician from 1992 through 2007.  (Tr. 154).  Plaintiff quit working in April 2007, due to his medical condition.  (Tr. 153).

On March 30, 2007, Plaintiff saw Dr. Sheri Lofton at Allina Medical Clinic-Cottage Grove and complained of right hip pain and low back pain that was not relieved with Tylenol and was getting worse. (Tr. 245-46). Dr. Lofton noted Plaintiff was limping, but the only finding on examination was tenderness in the right sacroiliac joint. (Id.) An x-ray of Plaintiff's right hip was also normal. (Tr. 246). Dr. Lofton gave Plaintiff Toradol, Demerol and Vistaril, and his pain resolved almost completely. (Tr. 246). She also prescribed a Medrol Dosepak and Vicodin. (Id.)

Plaintiff returned to Dr. Lofton about a week later because the medications were not helping his low back and hip pain. (Tr. 243). Plaintiff was not in acute distress upon examination; and he could heel and toe walk, forward flex and extend; there was no tenderness to palpation; strength, sensation and pulse were intact to his leg; and straight leg raise test was negative. (Id.) Dr. Lofton referred Plaintiff to the hospital because Vicodin had not relieved his pain. (Id.)

Plaintiff was admitted to United Hospital that day. (Tr. 199). Plaintiff said the pain was the same as after a work injury he suffered in the 1980s. (Tr. 200). His history included lumbar laminectomy in the 1980s with intermittent low back pain for the last six months. (Tr. 202). He also had a history of myocardial infarction in 2000 with stents, hyperlipidemia, hypertension, and carotid stenosis, status post left carotid endarterectomy. (Id.) While hospitalized, Plaintiff underwent the following diagnostic procedures: x-ray of his right hip and lumber spine, MRI of his hip, pelvis, and ultrasound of his right leg. (Tr. 220-21, 223-26). MRI of his right hip and pelvis showed: 1) moderate to advanced loss of cartilage in the right hip, consistent with moderate osteoarthritis; 2) milder osteoarthritis in the left hip; and 3) mild bilateral gluteal tendinopathy. (Tr. 220-21). X-ray of Plaintiff's

lumbar spine indicated lumbar spondylosis[1] with mild subluxation[2] of L2 on L3, mild spurring at all levels and most severe changes at L2-3. (Tr. 224). Plaintiff also had a recent MRI of his lumbar spine that he brought to the hospital, which indicated: 1) moderate multi-level degenerative disc and facet disease with moderate disc bulging at L3-4, resulting in moderate bilateral neuroforaminal stenosis, and 2) a disc protrusion at L3-4 resulting in moderate left foraminal stenosis. (Tr. 202). There were also postoperative changes and a small amount of enhancing epidural granulation tissue.[3] (Id.) An ultrasound of Plaintiff's right leg was negative for deep venous thrombosis. (Tr. 223).

Dr. Georgia Taggert saw Plaintiff upon admission. (Tr. 202-04). Plaintiff generally looked comfortable, but had pain with movement. (Tr. 203). Dr. Taggart opined that Plaintiff's radicular pain in the right leg would correspond to the MRI changes showing enhancing granulation tissue at L5-S1. (Tr. 204). She referred Plaintiff for a neurosurgery consultation and started him on corticosteroids, narcotics, and Vistaril for muscle spasm. (Id.)

The next day, Plaintiff underwent a neurosurgery consultation with Nurse Practitioner Teresa Armenta. (Tr. 205). Plaintiff's physical examination was normal with the exception of mild pain of the right hip with rotation. (Tr. 206). Nurse Armenta stated there was "no

---

[1] Spondylosis is a term often applied nonspecifically to any lesion of the spine of a degenerative nature. *Stedman's Medical Dictionary* ("*Stedman's*") 1813 (28th ed. 2006).

[2] Subluxation is an incomplete dislocation; "although a relationship is altered, contact between joint surfaces remains." *Stedman's* at 1856.

[3] Granulation tissue is the formation of minute, rounded, fleshy, connective tissue projections on the surface in the process of healing. *Stedman's* at 830.

obvious lesion on MRI to account for his right-sided pain." (Id.)  Plaintiff was given Valium to treat muscle spasms. (Tr. 207).  Nurse Armenta discussed Plaintiff's examination and films with Dr. Gregory.  (Tr. 206).  According to the discharge notes, Dr. Gregory, a neurosurgeon, felt the changes shown on the MRI of Plaintiff's spine could not explain the severe pain he was having.  (Tr. 200).  Dr. Gregory did not feel there was a surgical indication.  (Id.)

Plaintiff also had a neurological consultation that day with Dr. Paul Schanfield.  (Tr. 208-09).  Dr. Schanfield noted that Plaintiff was miserable on evaluation, but he had normal strength, good range of motion, and little tenderness.  (Tr. 208).  However, straight leg raise test was positive, and Plaintiff appeared "very jumpy and kind of impulsive."  (Id.)  Dr. Schanfield opined that "this man certainly could have some lumbar stenosis causing some pain as is mentioned on the MRI scan, although I would agree with Dr. Gregory that I would look at the right hip first . . ."  (Tr. 208).

On April 6, Plaintiff saw Nurse Practitioner Debra Hauser.  (Tr. 212-16).  Nurse Hauser noted that Plaintiff worked as a dental technician and only missed work on four occasions in twenty years.  (Tr. 212).  Plaintiff usually worked ten to twelve hours a day, and he had to carry fifty pound dental molds up and down stairs.  (Tr. 213).  Plaintiff also saw Dr. H. William Park, who opined that Plaintiff's low back pain with radiating right leg pain was most likely due to L2-L3, L3-L4 spinal stenosis with radiculitis, and the mild degenerative joint disease of his right hip was of questionable significance.  (Tr. 210).  He recommended an epidural injection.  (Id.)

Prior to discharge, Plaintiff saw Dr. Marie Leisz in a physical medicine and rehabilitation consultation.  (Tr. 217-19).  Dr. Leisz noted Plaintiff had no improvement with

epidural and hip injections, but his pain improved with MS Contin and Neurontin. (Tr. 217).
Plaintiff's physical examination was mostly normal, but he had pain complaints. (Tr. 218).
Dr. Leisz recommended aggressive pain management and physical therapy. (Tr. 219).

Dr. Anca Toma discharged Plaintiff from United Hospital on April 10. (Tr. 199-201).
Plaintiff's discharge diagnoses included right hip pain due to degenerative disc disease of
the right hip; right back pain due to spinal stenosis; hypertension, dyslipidemia, carotid
stenosis, status post left carotid endarterectomy, and status post lumbar laminectomy. (Tr.
199). Dr. Toma opined that it was still unclear which was the major cause of Plaintiff's pain,
his hip or his lumbar spine, but that maybe both were contributing. (Tr. 200). Plaintiff's
new medications upon discharge were Valium, morphine, Oxycodone, Lidoderm patch and
Neurontin. (Id.)

Plaintiff saw Dr. Lofton on April 17, in follow up from his hospital stay. (Tr. 240).
Plaintiff reported that some days he only took his medications twice a day because he was
very tired. (Id.) He reported that he was falling down when he got up in the morning, but
not during the day. (Id.) He had been active at home, including dusting. (Id.) Dr. Lofton
referred Plaintiff to the Pain Center. (Id.)

Approximately a month after he was discharged from the hospital, Plaintiff saw Dr.
Zohreh Mahdavi at Neurological Associates of St. Paul, and reported that he was in
excruciating pain. (Tr. 229). He also had trouble getting started in the morning and
sometimes nearly fell. (Id.) Dr. Mahdavi noted, "[w]hen asked how he is walking, the
patient gets up and then shouts. He suddenly stoops down and with some effort, stands
himself up and actually seems to do quite well after this initial bizarre movement. The
patient otherwise has a fairly steady looking walk once he is up and going." (Id.) Dr.

6

Mahdavi recommended ongoing physical therapy. (Tr. 230). The next day Plaintiff had an EMG, and Dr. Mahdavi opined, "[t]here are electrical changes that could be consistent with a mild, chronic S1 radiculopathy. There are no superimposed changes to suggest the presence of an acute denervating process to account for the patient's symptoms." (Tr. 233).

On May 15, 2007, Plaintiff saw Dr. Angelito Sajor at the United Pain Center, and complained of right buttock and hip pain radiating down his right leg, and rated the pain at a level of eight or nine out of ten. (Tr. 263-66). Dr. Sajor noted that Plaintiff "claims that his pain is not well controlled," although he was taking morphine and four to six Oxycodone pills a day for breakthrough pain. (Tr. 265). On physical examination, Plaintiff was very anxious looking, he used a cane and limped on the right side, but had only tenderness on examination. (Id.) Dr. Sajor stated, "[a]t this point of time, it is unclear if his pain is because of the granulation tissue at the level of L5-S1, but based on the distribution of his pain, it seems to be at the level of the L2-L3, where he had a foraminal stenosis without evidence of nerve impingement." (Tr. 266). Dr. Sajor recommended Celebrex and physical therapy. (Id.) Plaintiff saw Dr. Lofton the next day. (Tr. 236-37.) She noted that Plaintiff believed his pain was mainly from his hip, not his back, and the pain was different from when he had lumbar surgery twenty years earlier. (Tr. 237).

The next week, Plaintiff saw Psychologist Robert Tolles upon referral by Dr. Sajor. (Tr. 257). Dr. Tolles noted that Plaintiff endorsed only sporadic anhedonia and dysthymia. (Id.) Plaintiff reported that his pain medications "jazz him up during the day" and make him like a zombie first thing in the morning. (Id.) Sometimes, Plaintiff stayed up reading until 3:00 or 4:00 a.m., he dusted the house because he was bored, he vacuumed and did other

chores, watched television, and saw his daughter. (Tr. 258). He used a cane at home to prevent himself from falling. (Id.) Tolles diagnosed pain disorder with psychological forces of sporadic anhedonia, dysthymia and a general medical condition. (Tr. 261). He assessed a GAF score of 58.[4] (Id.)

Plaintiff saw Dr. Sajor again on May 30, 2007, and reported he was in less pain and had no adverse reaction from medications. (Tr. 255). Plaintiff walked without a cane but with a slight limp on the right side. (Id.) The only finding on examination was mild tenderness over the right upper gluteal area. (Id.) Dr. Sajor recommended discontinuing morphine and starting a Fentanyl patch, discontinuing Valium, and using Oxycodone for breakthrough pain. (Tr. 256).

At the request of the Social Security Administration, Dr. George Salmi completed a Physical Residual Functional Capacity Assessment regarding Plaintiff on July 2, 2007. (Tr. 276-83). Dr. Salmi opined that Plaintiff could occasionally lift and carry twenty pounds and ten pounds frequently, stand and/or walk six hours out of an eight-hour day; sit for six hours of an eight-hour day; never climb ladders, ropes and scaffolds; occasionally climb ramps and stairs; and occasionally balance, stoop, kneel, crouch, crawl. (Tr. 277-78). Dr. Salmi's opinion was affirmed by Dr. Sandra Eames on January 29, 2008, and again by Dr. Leah Holly on February 26, 2008. (Tr. 293-95, 302-03). Dr. Holly noted "[t]he claimant's use of a cane appears to be related to instability resulting from medication effects. With adjustment of the narcotic medication scheduling and dosages, these side effects appear

---

[4]     A GAF score of 51 to 60 indicates moderate symptoms. Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994)).

to be minimized.   The claimant does not appear to require a cane for standing or ambulation." (Tr. 302).

Plaintiff was admitted to United Hospital on September 24, 2007, for severe back and right leg pain with increasing depression.  (Tr. 410).  Only a short summary of this hospitalization is in the record.   Plaintiff saw Dr. Sairam in Psychiatry, and Dr. Sairam switched Plaintiff from Zoloft to Effexor.  (Id.)  Dr. Sairam noted that Plaintiff's pain was severe on admission but was now mild. (Id.)  Plaintiff's Simvastatin[5] was stopped because it had a tendency to cause hip pain. (Id.)  Dr. Thomas Winter stated, "[h]opefully he will be able to return to his job as a dental prosthetic technician in the near future."  (Id.)

Plaintiff underwent an initial assessment for physical therapy at Sister Kenny Sports & Physical Therapy Center Cottage Grove ("Sister Kenny") on October 5, 2007.  (Tr. 400-02).  Plaintiff reported that his prior job duties included standing 95% of the time, carrying fifty pound boxes, and climbing four flights of stairs. (Tr. 401).  Now, he was restricted to lifting twenty pounds, his pain increased with sitting, but decreased with a lumbar cushion or walking.  (Id.)  On examination, he had some back pain with lumbar flexion, and decreased hip flexion.  (Id.)  His tolerance to physical therapy treatment was good, and it did not increase his pain.  (Tr. 402).

In Plaintiff's next physical therapy session, he reported that he was walking three to five minutes, ten to twelve times a day at home, and his pain was better after physical therapy.  (Tr. 398-99).  Three days later, Plaintiff reported that he mowed his lawn the

---

[5]        Simvastatin is a generic drug, also sold under the brand name Vytorin. *Physician's Desk Reference* 2335 (65th ed 2011).  It is indicated to treat hyperlipidemia. Id.  "Simvastatin, like other statins occasionally causes myopathy manifested as muscle pain, tenderness or weakness. . ." Id. at 2336.

previous day, taking breaks every five or ten minutes, and he had some increased right hip and leg pain the next morning, which improved with medication.  (Tr. 396).  He also reported having some lightheadedness when getting out of bed.  (Id.)

In physical therapy on October 16, 2007, Plaintiff reported lower back pain at a level of five out of ten after getting up in the morning, and it decreased shortly after moving around.  (Tr. 394).  He had some shakiness and lightheadedness from his medications. (Id.)  The next week, Plaintiff reported that he had pain during a 200-mile drive to see his sister, during which he took about eight stops.  (Tr. 390).  His pain had increased to a level eight out of ten in his lower back and both hips.  (Id.)  His pain after treatment, however, was only at a level of one or two out of ten, but he fatigued easily, and took more breaks. (Tr. 391).

Plaintiff had a follow up visit with Dr. Sairam regarding his depression on October 24, 2007.  (Tr. 337).  On mental status examination, Plaintiff's mood was a mixture of depression and mild anxiety, and his affect was restricted.  (Id.)   Plaintiff's sleep was adequate with the medication Trazadone, and his tremulousness might have been caused by the medication Effexor.  (Id.)  In physical therapy two days later, Plaintiff had persistent tremors and involuntary facial contractions.  (Tr. 348-49).  He was noted to be seeing a doctor for weakness, shortness of breath, shakiness and cold.  (Tr. 349).

Plaintiff saw Dr. Sairam again on November 21.  (Tr. 335-36).  He was attending psychiatric day treatment at United Hospital,[6] and had recurrent depressive symptoms after going home from the hospital.  (Tr. 335).  On mental status examination, he was less

---

[6]     There are no records of Plaintiff's day treatment program in the SSA administrative record.

anxious and shaky than the last visit, and his mood was depressed.  (Id.)  Dr. Sairam noted

Plaintiff's tremulousness was possibly from sensitivity to serotonergic medications.  (Tr.

336).

On January 24, 2008, Plaintiff had an initial assessment at Sister Kenny for physical

therapy to treat neck pain.  (Tr. 374-77).  He reported that his neck pain made it difficult for

him to sleep and turn his head when driving a car.  (Tr. 374).  His initial pain rating was

seven out of ten, but after treatment that day, it was zero.  (Tr. 374, 377).  He continued to

have physical therapy for neck pain through February 22, 2008.  (Tr. 378-89, 346-47).  He

usually had no neck pain after treatment.  (Id.)  He continued to report episodes of low back

pain, but that was not addressed in physical therapy during this time.  (Id.)

Plaintiff saw Dr. James Sturm at Physician Neck and Back Clinics on February 19,

2008.  (Tr. 310-14).  Plaintiff reported his back pain was worse than his leg pain, and his

employer would not take him back until he was 100% ready to return to work.  (Tr. 310).

Plaintiff's neck pain was asymptomatic.  (Id.)  His low back pain was at a level eight out of

ten, and was constant with attacks of worsening pain.  (Tr. 312).  Dr. Sturm noted Plaintiff

"had a plausible looking pain diagram."  (Id.)

Plaintiff reported that his most recent surgery was in the 1980s.  (Tr. 311).  He

initially had good relief, but told Dr. Sturm most of his preoperative symptoms returned in

six months to a year.  (Id.)  He returned to work at a less strenuous job with a different

employer, and was given a permanent disability rating of 20%.  (Id.)

On examination, Plaintiff's gait was normal; he walked without difficulty; he had

some slightly reduced range of lumbar motion, lumbar tenderness, no muscle spasm; and

straight leg raise on the right was limited to sixty degrees.  (Tr. 312-13).  Dr. Sturm

11

diagnosed mechanical low back pain, post laminectomy syndrome lumbar, and deconditioning syndrome.  (Tr. 313).  He recommended a short term active rehabilitation program.  (Id.)

Plaintiff followed up with Dr. Saraim on April 16, 2008.  (Tr. 332-34).  He reported that he discontinued his day treatment in February and was doing "really well."  (Tr. 332).  He had an acute exacerbation of back pain, and was hoping to have back surgery in a few weeks.  (Tr. 332-33).  His mental status was normal.  (Tr. 333).  When Plaintiff returned on June 19, he was recovering from a three-level lumbar laminectomy[7] and suffered mild situational anxiety.  (Tr. 330-31).  Dr. Saraim noted Plaintiff was coping well with pain and stress and used Xanax only occasionally.  (Tr. 331).  His mental status was normal.  (Id.)

Plaintiff started physical therapy for his lumber spine at Sister Kenny on June 27, 2008, after having a lumbar laminectomy on May 9, 2008.  (Tr. 370-73).  Plaintiff reported the surgery was helpful in reducing his lumbar pain.  (Tr. 371).  He reported no pain during or after his physical therapy that day.  (Tr. 373).  Plaintiff continued to feel well during his therapy sessions through July 15.  (Tr. 362-67.)  He felt increased lumbar pain on July 17 and 22, after his medications were decreased, but on July 22, his pain decreased with exercise.  (Tr. 358-61).  In late July and early August 2008, Plaintiff rated his lumbar pain zero out of ten, and reported his back continued to feel well.  (Tr. 344-45, 350-57).

_____

[7]        There are no medical records from this surgery in the SSA administrative record.

On September 18, 2008, Dr. Sairam noted it was Plaintiff's first follow up appointment since his inpatient psychiatry discharge on August 18.  (Tr. 328).[8]  He noted that Plaintiff was "doing ok" in spite of chronic pain, financial difficulties, and the fact that his house may be foreclosed.  (Id.)  Plaintiff was not under acute anxiety, and his  mental status examination was normal.  (Id.)  Dr. Sairam diagnosed mood disorder due to chronic pain.  (Id.)  Plaintiff did not see Dr. Sairam again until December 15, 2008, and reported he was doing a lot better.  (Tr. 327).  He moved to Hinckley when his city home was near foreclosure.  (Id.)  He was more socially active, and his pain improved to a level three out of ten on average.  (Id.)

Plaintiff followed up with Dr. Sairam again on May 4, 2009.  (Tr. 325).  Dr. Sairam noted Plaintiff's depression was controlled; he had no recurrent anxiety; he made friends locally; his sister lived nearby; and his pain control was satisfactory.  (Id.)  On mental status examination, Plaintiff exhibited minimal pain behaviors, and his mood was quite good.  (Tr. 326).

The next medical record is from September 8, 2009.  (Tr. 338).  Plaintiff underwent a physical performance test at Sister Kenny.  (Tr. 338-43).  On physical examination, Plaintiff had some decreased forward bending, decreased lower extremity range of motion from knee to chest and the hamstrings.  (Tr. 339).  Plaintiff did not perform any test activities adequately.  (Id.)  The evaluator, Occupational Therapist Kris Hallenberg, stated "test performance was significantly limited by pain focused behavior."  (Tr. 340).  Plaintiff

---

[8]      There are no medical records in the SSA administrative record of Plaintiff's inpatient psychiatric treatment from which he was discharged on August 18, 2008.

demonstrated frequent pain behaviors and reports of increased low back and right thigh pain.  (Id.)  Plaintiff rated his pain at a level of eight out of ten prior to testing and seven out of ten after testing.  (Id.)

Hallenberg noticed several inconsistencies.  (Id.)  First, Plaintiff arrived with a cane in his right hand, but this was not consistent with reports of increased right thigh pain.  (Id.) Also, Plaintiff demonstrated a step to gait pattern with increased right lower extremity weight bearing, which was not consistent with a report of increased right thigh pain.  (Id.) Hallenberg stated, "based on inconsistencies noted between preliminary assessment and performance of activities, as well as exertion levels, test results are not considered reliable." (Id.)  She further stated, "[t]esting results give an indication of his pain tolerance to activity rather than his physical maximum."  (Id.)  Plaintiff's residual functional capacity, based on the test results, was that he could sit for two hours; stand for short intervals; walk short distances; rarely bend or stoop; never squat or climb a ladder; occasional push/pull; carry and lift one to ten pounds from the waist; never lift from the floor; and no firm grasping.  (Tr. 341-42).

Dr. Sheri Lofton wrote a letter on October 6, 2009, expressing her opinion that since April 25, 2005, Plaintiff's impairments would have prevented him from sustaining more than sedentary activities, and that he was not capable of being on his feet more than two hours a day, and "will not likely be capable of lifting 20 pounds occasionally over the course of sustained continued employment without experiencing more pain and fatigue."  (Tr. 411). She explained that her opinion was based on her review of the medical records, including the functional evaluation at Sister Kenny, and her examination and treatment of Plaintiff.

(Id.)  She further stated it was her opinion that Plaintiff's complaints regarding his limitations were consistent with his medical findings.  (Id.)

**B.    Administrative Hearing**

Plaintiff testified at an administrative hearing before ALJ George Gaffaney on October 1, 2009.  (Tr. 25).  Plaintiff testified as follows.  He moved stiffly because he had low back pain that traveled down his leg, which sometimes gave out and caused him to fall.  (Tr. 28).  Plaintiff quit his job in April 2007, because he couldn't handle the pain anymore.  (Tr. 31-32).  Plaintiff also reported that Dr. Sairam was treating him for "bipolar."  (Tr. 32).  He was hospitalized for suicidal thoughts in September 2007.  (Tr. 32-33).  Then, he had day treatment for depression.  (Tr. 33).  After day treatment, he had good days and bad days.  (Tr. 34-35.)  He was hospitalized for depression again in September 2008.  (Tr. 35).

Plaintiff's past work as a lab technician was fast-paced.  (Tr. 35-36).  Plaintiff could no longer do the job because if he was on his feet up to two hours, he had to lie down and take Oxycodone.  (Tr. 36).  He also had difficulty with his memory and concentration due to his medications, which made him tired.   (Tr. 36-37, 40-41).   He used three antidepressants and Fentanyl, Oxycodone, oxycarbonate and Lyrica for pain, but his leg still gave out, and he had right thigh pain.  (Tr. 38- 40).  He also used a cane because he fell down often.  (Tr. 42).  During the day, he had to lay down every hour-and-a-half to two hours.  (Tr. 43).  The ALJ asked Plaintiff if he had a history of chemical dependency.  (Tr. 44).  Plaintiff said that he did in the 1980s, when he hurt his back, but he had only one or two beers in the last two years.  (Id.)

David Russell testified as a vocational expert ("VE") at the hearing.  (Tr. 48).  The ALJ asked Russell whether a person of Plaintiff's age, education, and work history could

perform his past work within the following limitations:  lifting twenty pounds occasionally and ten frequently; sit and stand six hours each in an eight-hour workday; no ladder climbing; and occasional stair climbing, balance, stoop, kneel, crouch or crawl.  (Tr. 49).  The VE testified such a person could perform Plaintiff's past job as it is normally performed as a light duty job, according to the Dictionary of Occupational Titles.  (Tr. 49-50).

The ALJ posed a second hypothetical question limiting the person to lifting ten pounds occasionally and five pounds frequently; stand two hours in an eight-hour day; sit six hours; with nonexertional limitations the same as the first hypothetical question.  (Tr. 50).  The VE testified such a person could not perform Plaintiff's past work because the hypothetical question called for sedentary work.  (Id.)    The VE also testified that there were readily transferable job skills relating to sedentary work including soldering, assembly, and fabrication, at a lower level.  (Id.)  This would include jobs such as lock assembler, brush polisher and jewelry and watch assembler.  (Id.)  There are about 7,000 assembly jobs in Minnesota.  (Tr. 51).

The ALJ then posed a third hypothetical question that was the same as the second, but work would be limited to semiskilled.  (Id.)  The VE testified that all the jobs he cited were lower level semiskilled.  (Id.)  For a fourth hypothetical question, the ALJ added to the second hypothetical question restrictions of simple, routine work with occasional changes in the work setting.  (Id.)  The VE testified the jobs would be routine but not simple, which he usually related to unskilled work.  (Id.)  And for a final hypothetical question, the ALJ added to the first hypothetical question, the restriction of unable to sustain an eight-hour workday.  (Id.)  The VE testified such a person could not perform any job on a full-time competitive basis.  (Tr. 52).

16

### C.   ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.   The claimant has not engaged in substantial gainful activity since April 25, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: Degenerative Disc Disease, Status Post Laminectomy, Degenerative Joint Disease of the Right Hip (20 CFR 404.1520 (c) and 416.920(c). . . .

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). . . .

5.   The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with lifting twenty pounds occasionally, ten pounds frequently, standing six hours out of an eight hour work day, sitting six hours out of an eight hour work day, except no climbing of ladders, only occasional climbing of stairs, balancing, stooping, kneeling, crouching or crawling. . . .

6.   The claimant is capable of performing past relevant work as a dental lab technician . . . (20 CFR 404.1565 and 416.965). . . .

7.   The claimant has not been under a disability, as defined in the Social Security Act, from April 25, 2007 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 13-19).

## III.   CONCLUSIONS OF LAW

17

## A.     Standard of Review

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In making a disability determination, the ALJ must follow a sequential evaluation process which applies to both physical and mental disorders. 20 C.F.R. §§ 404.1520, 416.920 outline the five-step sequential process used by the ALJ to determine whether a claimant is disabled. At the first step, the ALJ must consider the claimant's work history. (Id.) At the second step, the ALJ must consider the medical severity of the claimant's impairments. (Id.) At the third step, the ALJ must consider whether the claimant has an impairment or impairments that meet or medically equal one of the listings in Appendix 1 to Subpart P of the regulations. (Id.) If the claimant's impairment does not meet or equal one of the listings in Appendix 1, at step four, the ALJ must make an assessment of the claimant's residual functional capacity and the claimant's ability to perform her past relevant work. (Id.) If the claimant can perform her past relevant work, the ALJ will find that she is not disabled. (Id.) If the claimant cannot perform her past relevant work, the "burden of proof shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and second, that other such work exists in substantial numbers in the national economy." Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000).

Judicial review of the final decision of the Commissioner is restricted to a determination of whether substantial evidence on the record as a whole supports the

decision.  42 U.S.C. 405(g); Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007).

"Substantial evidence is relevant evidence that a reasonable mind would accept as

adequate to support the Commissioner's conclusion."  Tellez v. Barnhart, 403 F.3d 953,

956 (8th Cir. 2005) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).  In

determining whether evidence is substantial, the court must consider both evidence that

supports and evidence that detracts from the Commissioner's decision.  Moore ex rel

Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005).  If it is possible to draw two

inconsistent positions from the evidence, and one of those positions represents the

Commissioner's findings, the court must affirm the Commissioner's decision.

Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005).

Plaintiff makes four arguments in support of his motion for summary judgment.

First, Plaintiff contends the ALJ erred by not granting controlling weight to Dr. Lofton's

opinion regarding Plaintiff's residual functional capacity.  Second, Plaintiff argues the

ALJ erred by substituting his own opinions for those of a physician.  Third, Plaintiff

contends the ALJ should have recontacted Dr. Lofton.  Fourth, Plaintiff argues the VE's

response to the ALJ's hypothetical question does not constitute substantial evidence

because the hypothetical question did not include an accurate description of Plaintiff's

limitations.

### B.   Substantial Evidence Supports the ALJ's Decision Not to Grant Controlling Weight to Dr. Lofton's Opinion

A treating physician's opinion is typically entitled to controlling weight if it is "'well-

supported by medically acceptable clinical and laboratory and diagnostic techniques

and is not inconsistent with the other substantial evidence in [the] record.'"  Leckenby v.

Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quoting Prosch v. Apfel, 201 F.3d 1010,

1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)).  A non-treating

physician's assessment, when the physician has not examined the claimant, normally

does not constitute substantial evidence on the record as a whole.  Vossen v. Astrue,

612 F.3d 1011, 1017 (8th Cir. 2010).  However, there are circumstances "in which

relying on a non-treating physician's opinion is proper."  Id.

    Plaintiff contends Dr. Lofton's RFC opinion meets the criteria to be granted

controlling weight because it is based on her observations and treatment of Plaintiff over

an extended time and on the objective test results of Plaintiff's physical performance

test at Sister Kenny.  Plaintiff also contends Dr. Lofton's opinion is not inconsistent with

other substantial evidence in the record.  Plaintiff asserts the ALJ stated he was

discounting Dr. Lofton's opinion because of one statement Plaintiff made to Dr. Sairam.

    Defendant, on the other hand, argues that the ALJ relied on a number of

inconsistencies in the record in discounting Dr. Lofton's opinion, including:  1) Dr.

Sairam's observation in May 2009 that Plaintiff had improved energy and exhibited

minimal pain behaviors; 2) a physical therapist's findings that Plaintiff had minimal back

pain and improved strength; 3) a physical therapist's notes that Plaintiff reported walking

at least one-half mile per day in July and August; and 4) Plaintiff's performance of

medium work until April 25, 2007.  Additionally, Defendant contends Dr. Lofton did not

explain her opinion beyond her assertion that she relied on her treatment records and

the physical performance test results.  Defendant points out that the evaluator of

Plaintiff's physical performance test indicated the test results were unreliable.  Finally,

Defendant asserts Dr. Lofton's opinion was inconsistent with her own office notes, and

cites the results of Plaintiff's physical examinations by Dr. Lofton in July 2006, March 2007, and April 4, 2007.

Plaintiff is incorrect in his assertion that the ALJ discounted Dr. Lofton's opinion based on one statement Plaintiff made to Dr. Sairam. The ALJ also relied on several physical therapy notes indicating Plaintiff's pain was reduced and his strength increased in July and August 2008. (Tr. 19). The ALJ also rejected the findings of the physical performance test at Sister Kenny, because the evaluator found the results invalid due to Plaintiff's self-limiting pain behaviors and inconsistencies with his pain complaints and use of a cane. (Tr. 18-19). The ALJ also relied on the fact that Plaintiff stated he had poor relief from his previous back surgery in the 1980s, but he continued to do medium exertional level work until April 25, 2007. (Tr. 18). The ALJ also pointed out inconsistencies in Plaintiff reporting whether his pain came from his hip or his lower back. (Tr. 18).

The physical performance test Plaintiff underwent was intended to determine his physical limitations, but the test results were invalid. Therefore, it was proper for the ALJ to discount the test results, and to discount Dr. Lofton's opinion, which in part relied on those results. See Boyd v. Astrue, Civ. No. 08-785 (MJD/FLN), 2009 WL 1514505, at *10 (D.Minn. 2009) (ALJ gave valid reasons for discounting functional evaluation where claimant gave submaximal effort and a "presentation of inappropriate illness behavior.")

The MRIs of Plaintiff's back and hip provide some objective evidence of pain causing impairments, but these test results alone do not explain the frequency, severity and resulting limitations from Plaintiff's degenerative disease of the hips and lumbar

21

spine.  One of the other indications of the severity of pain from stenosis, osteoarthritis, degenerative disc disease or herniated disc is evidence of limitation of motion, motor loss (muscle weakness), and sensory and reflex loss.  See 20 C.F.R. 404, Subpart P, Appendix 1, §1.04A.  Over the relevant time period, Plaintiff had occasional mild to moderate limited range of motion, an occasional positive straight leg raise test, but his strength, sensation and reflexes were intact.  Plaintiff's physical examinations, including those by Dr. Lofton, did not support the severity of his pain complaints.  Because the physical performance test was invalid and the objective evidence as a whole did not support Dr. Lofton's RFC opinion, this is one factor upon which the ALJ could properly discount Dr. Lofton's opinion.

In a case where a treating physician's opinion conflicts with a nonexamining physician's opinion, consistency with the other substantial evidence in the record is often an important factor.  The record as a whole indicates that Plaintiff was first treated for back, hip and leg pain in April 2007, because Tylenol was ineffective and his pain was worsening.  When Dr. Lofton first treated Plaintiff, she gave him Demerol, which almost completely resolved his pain.  She prescribed Vicodin, but Plaintiff returned a week later and said the Vicodin was ineffective.  Plaintiff had been working in a medium exertional job as a dental lab technician for ten to twelve hours a day from 1992 through April 2007, and missed very little work.  Dr. Lofton referred Plaintiff to a hospital.

Plaintiff had lumbar laminectomy in the 1980's and on April 4, 2007, he told physicians at the hospital this was a similar pain.  Dr. Gregory, a neurosurgeon, opined that surgery was not indicated for Plaintiff's back.   On May 15, 2007, Plaintiff denied it was his back causing the pain, and said it was his hip.  When Plaintiff was taken off the

drug Simvastatin, which was known to potentially cause muscle pain, his hip pain improved.  At that time, Dr. Winter hoped Plaintiff would be able to return to his job in the near future.  In October 2007, during a physical therapy assessment, Plaintiff reported he had a twenty lifting restriction.

Plaintiff then complained of back pain.  Although there are no medical records indicating a recommendation for surgery or the actual records from the surgery, by history, Plaintiff had a lumbar laminectomy on May 9, 2008.  This decreased his pain, as did his following physical therapy through August 2008.  Plaintiff had no medical evaluation or treatment for his back, hip or leg pain between August 2008 and September 2009, when he underwent the physical performance test at Sister Kenny. All of the records leading up to Plaintiff's physical performance test indicated that exercise did not increase his pain, and his strength was improving.  There is nothing in the record to explain why Plaintiff's pain behaviors and complaints increased so dramatically from his last physical therapy session in August 2008.

In addition to these physical impairments, Plaintiff was hospitalized on two occasions for depression and/or anxiety, and attended a day treatment program.  There is a brief summary of the September 24-27, 2007 hospitalization, but the hospitalization from which Plaintiff was discharged on November 7, 2007, and the day treatment program are only noted by history in Dr. Sairam's treatment notes.  (Tr. 335, 410).[9] Nevertheless, Plaintiff does not contend he is disabled by his mental impairments.

---

[9]      Plaintiff also testified that he was hospitalized for psychiatric reasons in September 2008, but there are no such medical records in the administrative record.

Dr. Sairam's treatment notes, which covered the time period of September 2007 through May 4, 2009, indicate that Plaintiff was stressed by his pain and financial difficulties surrounding foreclosure of his home.  His pain and his financial difficulties were decreased by August 2008, and Plaintiff was doing much better mentally and physically.  Dr. Lofton's RFC opinion is inconsistent with this substantial evidence in the record.  Under these circumstances, it was appropriate for the ALJ to give more weight to the nonexamining physicians' less restrictive RFC opinions in determining Plaintiff's RFC.

**C.     The ALJ Did Not Substitute His RFC Opinion For Physicians' Opinions**

Plaintiff contends the ALJ substituted his own opinions of Plaintiff's RFC against those of a trained medical professional.  Although the ALJ stated that the opinions of the physicians employed by the State Disability Determination Services "deserve some weight," the ALJ in fact adopted the opinions of Dr. Salmi, Dr. Eames and Dr. Holly.  (Tr. 19 and see Tr. 276-83, 293-95, 302-03).  Thus, the ALJ properly relied on medical opinions in reaching his RFC determination.  See Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004) ("[i]n evaluating a claimant's RFC, the ALJ . . . is required to consider at least some supporting evidence from a professional.")

**D.     The ALJ Was Not Required to Recontact Dr. Lofton**

The ALJ found Dr. Lofton's opinion to be inconsistent and other substantial evidence in the record.  Plaintiff argues the ALJ should have recontacted Dr. Lofton to

question her about the inconsistencies.  Plaintiff cites 20 C.F.R. §§ 404.1512(e)(1),

416.912(e)(1) and Social Security Rulings 96-5p and 85-16p.

20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) provide:

> (e) *Recontacting medical sources*.  When the evidence we
> receive from your treating physician or psychologist or other
> medical source is inadequate for us to determine whether
> you are disabled, we will need additional information to reach
> a determination or a decision.  To obtain the information, we
> will take the following actions.
> (1) . . . We will seek additional evidence or clarification from
> your medical source when the report from your medical
> source contains a conflict or ambiguity that must be
> resolved, the report does not contain all the necessary
> information, or does not appear to be based on medically
> acceptable clinical and laboratory diagnostic techniques. . .

Social Security Ruling 96-5p states, in relevant part:

> Because treating source evidence (including opinion
> evidence) is important, if the evidence does not support a
> treating source's opinion on any issue reserved to the
> Commissioner and the adjudicator cannot ascertain the
> basis of the opinion from the case record, the adjudicator
> must make "every reasonable effort" to recontact the source
> for clarification of the reasons for the opinion.

Social Security Ruling ("SSR") 96-5p, 1996 WL 374183, at *6 (S.S.A. July 2, 1996).

Social Security Ruling 85-16p states, in relevant part:

> When medical source notes appear to be incomplete,
> recontact with the source should be made to attempt to
> obtain more detailed information.  Every reasonable effort
> should be made to obtain all medical evidence from the
> treating source necessary to make a determination of
> impairment severity and RFC before obtaining evidence from
> any other source on a consultative basis.

SSR 85-16p, 1985 WL 56855, at *3 (S.S.A. 1985).

In this case, Dr. Lofton stated her RFC opinion was based on her review of the medical records, including Plaintiff's physical performance test at Sister Kenny, and her treatment records.  She also opined that Plaintiff's subjective complaints were consistent with the medical findings.  Dr. Lofton's records were not incomplete and the basis for her opinion is ascertainable from her October 2009 letter.  She accepted the results of the physical performance test, and it was her opinion that Plaintiff's degenerative diseases of the lumbar spine and hip were significant enough to cause severe pain that would exclude more than sedentary work.  The fact that the state agency physicians reviewed the same records and came to a different conclusion is not a basis upon which the treating source had to be recontacted.  Where the record is complete, the ALJ can resolve the conflict between the opinions based on the ALJ's review of the substantial evidence in the record as a whole.  See Hacker v. Barnhart, 459 F.3d 934, 938-39 (8th Cir. 2006) (ALJ was not required to recontact treating physicians where their opinions were refuted by the record; and the ALJ could consider the opinions of state agency medical consultants.)

### E.    The ALJ Did Not Err by Relying on the VE's Testimony

Plaintiff's final argument is premised on the assumption that the ALJ improperly determined his RFC; and therefore, the VE's testimony does not constitute substantial evidence.  However, the Court has determined that the ALJ's RFC determination is supported by substantial evidence in the record as a whole.  The ALJ posed a hypothetical question to the VE that included the ALJ's RFC determination.  Under the circumstances, the VE's testimony in response to that hypothetical question is substantial evidence in the record upon which the ALJ properly relied in concluding that

Plaintiff could perform his past relevant work, as it is defined in the Dictionary of

Occupational Titles.  See Robson v. Astrue, 526 F.3d 389, 393 (affirming the

Commissioner's decision where hypothetical question the ALJ posed to the VE

contained all of the concrete consequences of the claimant's physical deficiencies

during the relevant time period.)

## IV.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED THAT:**

1.      Plaintiff's Motion for Summary Judgment (# 13) **be DENIED**;

2.      Defendant's Motion for Summary Judgment (# 16) **be GRANTED**;

3.      The case be **DISMISSED WITH PREJUDICE AND JUDGMENT BE**

        **ENTERED.**


DATED: June 15, 2011

                              _s/ Franklin L. Noel_____
                              FRANKLIN L. NOEL
                              United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and
Recommendation by filing with the Clerk of Court and serving on all parties, on or
before **June 29, 2011**, written objections which specifically identify the portions of the
proposed findings or recommendations to which objection is being made, and a brief in
support thereof.  A party may respond to the objecting party's brief within 14 days after
service thereof.  All briefs filed under the rules shall be limited to 3,500 words.  A district
court judge shall make a de novo review of those portions to which objection is made.
This Report and Recommendation does not constitute an order or judgment of the
District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.